## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| SQIP, LLC, | Case No. 24-cv-1111 (LMP/DJF) |
| Plaintiff and Counter-Defendant, | |
| v. | **ORDER ON**<br>**CLAIM CONSTRUCTION** |
| CAMBRIA COMPANY LLC, | |
| Defendant and Counter-Claimant. | |

Glenn E. Forbis and J. Bradley Luchsinger, **Harness, Dickey & Pierce, P.L.C., Troy, MI**; Douglas A. Robinson, **Harness, Dickey & Pierce, P.L.C., St. Louis, MO**; and Nathan D. Louwagie, **Carlson Caspers, Minneapolis, MN**, for Plaintiff/Counter-Defendant.

Eimeric Reig-Plessis, **Winston & Strawn LLP, San Francisco, CA**; and Eric H. Chadwick, **DeWitt LLP, Minneapolis, MN**, for Defendant/Counter-Claimant.

Plaintiff SQIP, LLC ("SQIP"), brought this lawsuit against Defendant Cambria Company LLC ("Cambria"), alleging that Cambria has infringed two of SQIP's patents. *See generally* ECF No. 51. The Court is now tasked with construing the meanings of certain claim terms in dispute. *See* ECF Nos. 71, 81, 83, 86.

## BACKGROUND

SQIP is the owner of U.S. Patent Nos. 9,511,516 (the "'516 Patent") and 10,376,912 (the "'912 Patent") (collectively, the "Patents-in-Suit"). ECF No. 51 ¶¶ 18, 20. Both Patents-in-Suit disclose apparatuses and methods relating to the manufacture of engineered

quartz surface products, which typically are installed as kitchen and bathroom countertops, tables, floor tiles, and similar surfaces. '516 Patent at 1:11–49; '912 Patent at 1:30–2:3.[1]

Cambria manufactures and sells quartz surface products. ECF No. 71 at 5.[2] For its part, Cambria is the owner of U.S. Patent No. 9,186,819 (the "'819 Patent"), titled "Synthetic Molded Slabs, and Systems and Methods Related Thereto." '819 Patent at [54], [73].[3] Like the Patents-in-Suit, the '819 Patent teaches systems and methods for manufacturing engineered stone surface products. *Id.* at 1:7–13.

## I.     The '516 Patent

The '516 Patent, titled "Method and Apparatus for Manufacturing Quartz Slab," issued on December 6, 2016, from U.S. Patent Application No. 14/496,249 (the "'249 Application"). '516 Patent at [21], [22], [54]. The '516 Patent observes that "[o]ne of the drawbacks of quartz is its perceived lack of natural, random looking veins and color patterns compared with natural stones." *Id.* at 1:45–47. To address this deficiency, the '516 Patent discloses apparatuses and methods for "producing a quartz based slab with single color patterns or multiple color patterns and/or veins." *Id.* at 1:47–49.

---

[1]     The '516 Patent and '912 Patent are found at ECF Nos. 72-1 and 72-2, respectively. For clarity, the Court cites to the Patents-in-Suit as "'516 Patent" and "'912 Patent" rather than their docket numbers. In addition, when citing passages from the specifications for the '516 and '912 Patents, the Court uses the following convention: [Patent No.] at [column]:[line(s)].

[2]     Unless otherwise indicated, when citing documents by ECF number, the Court cites the page numbers generated by CM/ECF rather than the documents' internal page numbers.

[3]     The '819 Patent is found at ECF No. 72-5. As with the Patents-in-Suit, the Court cites to the '819 Patent as "'819 Patent" rather than its docket number.

SQIP accuses Cambria, in relevant part, of infringing claims 1 and 14 of the '516 Patent. ECF No. 72-8 at 3. Claim 1 of the '516 Patent is an independent claim which discloses an apparatus for manufacturing quartz slabs:

1. An apparatus comprising:

a mold having a top opening which leads to an inner chamber, and the mold including a first wall, a second wall, a third wall, and a fourth wall, and a bottom which enclose the inner chamber;

a *first device* which is configured with respect to the mold to supply a first mixture of quartz and resin to the inner chamber of the mold; and

a *computer processor* which is configured to control the *first device* to supply the first mixture to the inner chamber of the mold through a first region of the top opening but not through a second region of the top opening during a first state, and to supply the first mixture to the inner chamber of the mold through the second region of the top opening, but not through the first region of the top opening during a second state.

'516 Patent at 11:63–12:11 (emphasis added). Claim 14 of the '516 Patent is an independent claim which discloses a method, rather than an apparatus, for manufacturing quartz slabs:

14. A method comprising

supplying a first mixture of quartz and resin to an inner chamber of a mold;

wherein the mold has a top opening which leads to the inner chamber, and the mold includes a first wall, a second wall, a third wall, and a fourth wall, and a bottom which enclose the inner chamber, and further comprising

using a *computer processor* to controllably supply the first mixture to the inner chamber of the mold through a first region of the top opening but not through a second region of the top opening during a first state, and

using the *computer processor* to controllably supply the first mixture to the inner chamber of the mold through the second region of the top opening, but not through the first region of the top opening during a second state.

*Id.* at 14:44–59 (emphasis added). The parties dispute the meanings of the terms "first device" and "computer processor" as used in claims 1 and 14 of the '516 Patent. *See* ECF No. 71 at 12–34; ECF No. 81 at 12–39.

Relevant here, the U.S. Patent and Trademark Office ("PTO") initially rejected claims 1 and 14 of the '516 Patent as initially disclosed in the '249 Application, finding that the claims were anticipated by Cambria's earlier-filed '819 Patent. ECF No. 72-4 at 5. The examiner observed that the '819 Patent "discloses a method and apparatus for forming engineered stone slabs using a mold having an open top and an inner chamber surrounded by five walls . . . , multiple devices for supplying a resin and quartz mixture to the mold . . . and a transport sheet." *Id.* The examiner further noted that the '819 Patent's claimed "supply devices are controlled by a control algorithm." *Id.*

To overcome the rejection, SQIP amended the rejected claims in the '249 Application and submitted arguments distinguishing the amended claims from Cambria's '819 Patent. *See* ECF No. 72-6 at 3, 7, 9, 14–21. Following the amendments, the '249 Application was allowed for issuance as the '516 Patent. ECF No. 72-7 at 2.

## II.    The '912 Patent

The '912 Patent, titled "Apparatus and Method for Depositing Color into Cracks of a Moving Formed Quartz Slab to Create Veins in an Engineered Stone," similarly discloses apparatuses and methods for manufacturing quartz slabs that mimic the appearance of veins in natural stones. *See* '912 Patent at 1:25–26, 1:66–2:3.

SQIP accuses Cambria of infringing claims 3 and 5 of the '912 Patent (the "'912 Asserted Claims"). ECF No. 72-8 at 17. Both of those claims depend from claim 1. '912

Patent at 15:32–43, 15:47–59. Claims 1, 3, and 5 disclose methods for creating and depositing color into cracks in engineered quartz slab:

1.    A method comprising

causing a first portion of a slab to move vertically out of alignment with an area of the slab surrounding the first portion of the slab and thereby introducing a first crack in the first portion of the slab by using a first device locating between the first portion and a ground surface to cause a force to be applied to the first portion of the slab; and

depositing a first material having a color into the first crack of the slab, so that the first crack with the deposited first material becomes a vein having the color of the first material;

wherein the first device causes the force to be applied to the first portion of the slab from below the first portion of the slab, and thereafter, the first material is deposited into the first crack of the slab from above the first portion of the slab; and

wherein the first device continues to cause the force to be applied to the first portion of the slab from below the first portion of the slab, while the first material is deposited into the first crack of the slab from above the first portion of the slab.

. . .

3.    The method of claim 1 further comprising

causing a second portion of the slab to move vertically out of alignment with an area of the slab surrounding the second portion of the slab and thereby introducing a second crack in the second portion of the slab by using a second device located between the second portion and a ground surface to cause a force to be applied to the second portion of the slab; and

depositing *a second material having a color* into the second crack of the slab, so that the second crack with the deposited second material becomes a vein having *the color of the second material.*

. . .

5.    The method of claim 1 further comprising

causing a plurality of further portions of the slab to move vertically out of alignment with corresponding areas of the slab surrounding the corresponding plurality of further portions of the slab and thereby introducing a corresponding plurality of further cracks in the plurality

of further portions of the slab by using a plurality of further devices each located between each of the corresponding portions and the ground surface; [and]

depositing *a material having a color* into the plurality of further cracks of the slab, so that the plurality of further cracks of the slab become veins having *a color of a deposited material*.

'912 Patent at 15:5–27, 15:32–43, 15:47–59 (emphasis added).

The parties dispute the definiteness of the terms "a second material having a color" and "the color of the second material" as used in claim 3, and "a material having a color" and "a color of a deposited material" as used in claim 5. *See* ECF No. 71 at 34–38; ECF No. 81 at 44–49.

## RELEVANT PRINCIPLES OF CLAIM CONSTRUCTION

The U.S. Court of Appeals for the Federal Circuit has "exclusive jurisdiction" over appeals from final decisions "in any civil action arising under . . . any Act of Congress relating to patents." 28 U.S.C. § 1295(a)(1). The Court therefore applies the law of the Federal Circuit for patent issues, including claim construction. *Int'l Bus. Machs. Corp. v. Zillow Grp., Inc.*, 50 F.4th 1371, 1376–77 (Fed. Cir. 2022). Issues pertaining to the claim construction are questions of law that courts, not juries, decide. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 387–88 (1996).

## I.    Claim Construction Generally

"The purpose of claim construction is to determine the meaning and scope of the patent claims asserted to be infringed." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) (citation modified). "[A] proper claim construction is one that will help a jury to understand the meaning of the claims." *CellTrust*

*Corp. v. ionLake, LLC*, 625 F. Supp. 3d 810, 833 (D. Minn. 2022) (citing *Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356, 1366 (Fed. Cir. 2004)); *see also Kaufman v. Microsoft Corp.*, 34 F.4th 1360, 1370 (Fed. Cir. 2022) ("A proper claim construction provides a legal standard for the jury to apply."). The Court is not bound by the parties' proposed constructions and may instead adopt its own construction. *Homeland Housewares, LLC v. Whirlpool Corp.*, 865 F.3d 1372, 1376 (Fed. Cir. 2017). In any event, the adopted construction must not change the scope of the claimed invention. *Am. Piledriving Equip., Inc. v. Geoquip, Inc.*, 637 F.3d 1324, 1331 (Fed. Cir. 2011).

Claim terms typically are given their "ordinary and customary meaning." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (citations omitted). A claim term's ordinary meaning is not necessarily "the meaning of the term in the abstract." *Id.* at 1321; *see also DeMarini Sports, Inc. v. Worth*, 239 F.3d 1314, 1324 (Fed. Cir. 2001) ("We cannot look at the ordinary meaning of the term . . . in a vacuum."). Instead, the ordinary meaning is that which a person of ordinary skill in the art ("POSITA") would have assigned to the term "at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1313. As a result, courts look to "those sources available to the public that show what a [POSITA] would have understood disputed claim language to mean." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004). Those sources fall into one of two categories: intrinsic evidence and extrinsic evidence.

A.    **Intrinsic Evidence**

Most persuasive is the intrinsic evidence, which includes "the words of the claims themselves, the remainder of the specification, [and] the prosecution history." *Phillips*, 415 F.3d at 1314 (quoting *Innova*, 381 F.3d at 1116); *see Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)) ("[I]ntrinsic evidence is the most significant source of the legally operative meaning of disputed claim language."). A patent's claims, both asserted and unasserted, may offer "substantial guidance" as to the meaning of a claim term, and "the context in which a term is used in the asserted claim can be highly instructive." *Phillips*, 415 F.3d at 1314. For example, "[b]ecause claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims." *Id.* On the other hand, a dependent claim that adds a limitation creates a presumption that the limitation is not present in the independent claim. *Id.* at 1314–15.

Patent claims also "must be read in view of the specification, of which they are a part." *Id.* at 1315 (citation omitted). The specification "is always highly relevant to the claim construction analysis" and is usually "dispositive" because "it is the single best guide to the meaning of a disputed term." *Id.* (citation omitted). A court may consider the embodiments of the claimed invention that are disclosed in the specification to clarify a disputed claim term because "[a] claim interpretation that excludes a preferred embodiment from the scope of the claim is rarely, if ever, correct." *Globetrotter Software, Inc. v. Elan Comput. Grp., Inc.*, 362 F.3d 1367, 1381 (Fed. Cir. 2004) (internal quotation marks omitted) (citation omitted). But courts must be cautious not to import limitations from the

8

specification—including any embodiments, regardless of whether they are "preferred"—into the claims.  *See Phillips*, 415 F.3d at 1323 ("[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments."); *GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1310 (Fed. Cir. 2014) (holding that "[i]t was error to import the structural limitations of [a] preferred embodiment" into a disputed claim term).

The prosecution history consists of "the complete record of the proceedings before the PTO and includes the prior art cited during the examination of the patent."  *Phillips*, 415 F.3d at 1317.  But the prosecution history "represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation."  *Id.*  Consequently, "it often lacks the clarity of the specification and thus is less useful for claim construction purposes."  *Id.*  The prosecution history nonetheless can offer insight into the meaning of a disputed claim term because it may demonstrate "how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be."  *Id.*

## B.    Extrinsic Evidence

Courts may also consider extrinsic evidence, which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises."  *Phillips*, 415 F.3d at 1317 (citation omitted).  However, extrinsic evidence generally is considered "less reliable" than the intrinsic evidence and must not be used "for the purpose of varying or contradicting the terms of the claims."  *Genuine Enabling Tech. LLC v. Nintendo Co.*, 29 F.4th 1365, 1372–73 (Fed. Cir. 2022)

(citations omitted); *see Anderson v. Int'l Eng'g & Mfg., Inc.*, 160 F.3d 1345, 1348 (Fed. Cir. 1998) ("[D]ictionary definitions of ordinary words are rarely dispositive of their meaning in a technological context."). Nonetheless, the ordinary meaning of a claim term "may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314. "In such circumstances, general purpose dictionaries may be helpful." *Id.*

## II.    Indefiniteness

A patent's written description of the claimed invention, including "the manner and process of making and using it," must be set forth "in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains . . . to make and use the same." 35 U.S.C. § 112(a). In other words, "a patent must be precise enough to afford clear notice of what is claimed." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 909 (2014). Therefore, although an issued patent is entitled to a presumption of validity, *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 412 (2007), a patent claim may be deemed invalid and unenforceable for indefiniteness "if it fails to provide a [POSITA] reasonable certainty regarding the scope of the claimed invention," *Synchronoss Techs., Inc. v. Dropbox, Inc.*, 987 F.3d 1358, 1366 (Fed. Cir. 2021) (citing *Nautilus*, 572 U.S. at 901). Courts may make determinations of indefiniteness during claim construction, *see id.* at 1365–67, and the party asserting indefiniteness must prove it "by clear and convincing evidence," *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017).

"The definiteness requirement must take into account the inherent limitations of language," and courts must keep in mind that "patents are 'not addressed to lawyers, or even to the public generally,' but rather to those skilled in the relevant art." *Nautilus*, 572 U.S. at 909 (quoting *Carnegie Steel Co. v. Cambria Iron Co.*, 185 U.S. 403, 437 (1902)). But the fact that a court "can ascribe *some* meaning to a patent's claims" is not sufficient, by itself, to satisfy Section 112(a)'s definiteness requirement. *Id.* at 911.

A claim term should be "construed consistently with its appearance in other places in the same claim or in other claims of the same patent," *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001), but "[e]ach claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims," 35 U.S.C. § 282(a).  In other words, patent claims are construed on a claim-by-claim basis, so even if a claim term appears in two independent claims in the same patent, and a court finds that term indefinite as to one of those claims, the other claim is still entitled to a presumption of validity.  *See Vascular Sols. LLC v. Medtronic, Inc.*, 117 F.4th 1361, 1370 (Fed. Cir. 2024) (reversing district court's finding of indefiniteness where independent claims using the same claim term were deemed to be "mutually exclusive" and directing the court to "conduct claim construction on a claim-by-claim basis").

## III.    Means-Plus-Function and Step-Plus-Function Claims

Section 112(f) of the Patent Act provides that:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the

corresponding structure, material, or acts described in the specification and equivalents thereof.

35 U.S.C. § 112(f). As the Federal Circuit explains, this means a patentee may either: (1) "recite, in the claim, a function without reciting structure for performing the function and limit the claims to the structure, materials, or acts disclosed in the specification (or their equivalents)"; or (2) "recite both a function and the structure for performing that function in the claim." *Dyfan, LLC v. Target Corp.*, 28 F.4th 1360, 1365 (Fed. Cir. 2022). Section 112(f) applies to the former, but not the latter. *Id.* Claim limitations to which Section 112(f) applies are generally known as "means-plus-function" or "step-plus-function" limitations. *Id.*

The inquiry as to whether Section 112(f) applies is a two-step process. *Id.* First, a court must determine whether the claim limitation at issue is "drafted in means-plus-function format," meaning the court must "construe the limitation to determine whether it connotes sufficiently definite structure to a [POSITA]." *Id.* If, and only if, the court determines that the claim limitation is drafted in means-plus-function format, the inquiry proceeds to the second step, and the court must determine "what structure, if any, disclosed in the specification corresponds to the claimed function." *Id.* (quoting *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1351 (Fed. Cir. 2015)).

Because invoking Section 112(f) is "typically a choice left to the claim drafter," the inclusion of the word "means" in a claim term is subject to Section 112(f). *Id.* Likewise, "in the context of method claims, the use of the term 'steps for' signals the drafter's intent to invoke" Section 112(f). *Masco Corp. v. United States*, 303 F.3d 1316, 1326 (Fed. Cir.

2002).  "The inverse is also true," however, and courts "presume that a claim limitation is not drafted in means-plus-function format in the absence of the term 'means.'"  *Dyfan*, 28 F.4th at 1365; *see also Masco Corp.*, 303 F.3d at 1327 (applying the same concept to method claims "[w]here the claim drafter has not signaled his intent to invoke [Section 112(f)] by using the 'step[s] for' language" (third alteration in original)).  The challenger can overcome the presumption against the application of Section 112(f) by demonstrating, by a preponderance of the evidence, that a POSITA "would not have understood the [claim] limitation[] to connote structure in light of the claim as a whole."  *Dyfan*, 28 F.4th at 1367.

The Federal Circuit has further explained that "nonce words[4] that reflect nothing more than verbal constructs may be used in a claim in a manner that is tantamount to using the word 'means.'"  *Id.* at 1365 (quoting *Williamson*, 792 F.3d at 1350).  Thus, even in the absence of terms like "means," a claim is subject to analysis under Section 112(f) if the claim's limitation has "no commonly understood meaning and is not generally viewed by one skilled in the art to connote a particular structure."  *Id.* at 1366 (quoting *Media Rts. Techs., Inc. v. Cap. One Fin. Corp.*, 800 F.3d 1366, 1372 (Fed. Cir. 2015)).

Importantly, "[c]laim terms 'need not connote a single, specific structure,' and may instead 'describe a class of structures' and still recite 'sufficiently definite structure.'"  *Id.* at 1366 (quoting *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1300 (Fed. Cir. 2014)).  As the Federal Circuit explains, structure can be recited in several ways, including by using

---

[4]     To further clarify, a "nonce word" is "[a] word occurring, invented, or used just for a particular occasion."  *Nonce Word*, Am. Heritage Dictionary (5th ed. 2016).

"'a claim term with a structural definition that is either provided in the specification or generally known in the art,' or a description of the claim limitation's operation and 'how the function is achieved in the context of the invention.'" *Id.* (quoting *Apple*, 757 F.3d at 1299). But a "structure disclosed in the specification is 'corresponding' structure *only* if the specification or prosecution history clearly links or associates that structure to the function recited in the claim." *Saffran v. Johnson & Johnson*, 712 F.3d 549, 562 (Fed. Cir. 2013) (citation omitted).

## IV.    Prosecution Disclaimer

"The purpose of consulting the prosecution history in construing a claim is to 'exclude any interpretation that was disclaimed during prosecution.'" *Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005) (quoting *ZMI Corp. v. Cardiac Resuscitator Corp.*, 844 F.2d 1576, 1580 (Fed. Cir. 1988)); *see Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1095 (Fed. Cir. 2013) (citation modified) ("Prosecution history disclaimer . . . promotes the public notice function of the intrinsic evidence and protects the public's reliance on definitive statements made during prosecution."). If a patentee "unequivocally disavow[s]" a particular definition or construction of a claim term to obtain a patent, "the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of the surrender." *Chimie*, 402 F.3d at 1384 (citation omitted). A patent application that distinguishes the claimed invention over prior art cited by an examiner "is indicating what the claims do not cover." *Ekchian v. Home Depot, Inc.*, 104 F.3d 1299, 1304 (Fed. Cir. 1997).

## ANALYSIS

With the foregoing principles in mind, the Court's duty is to "determine what claim scope is appropriate in the context of" the Patents-in-Suit. *O2 Micro*, 521 F.3d at 1361; *see also U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement."). In other words, the Court's role "is not to redefine claim recitations or to read limitations into the claims to obviate factual questions of infringement and validity but rather to give meaning to the limitations actually contained in the claims." *Am. Piledriving Equip., Inc.*, 637 F.3d at 1331.

## I.    Cambria's Waiver Argument

As an initial matter, Cambria urges the Court to disregard certain arguments and evidence introduced by SQIP for the first time in response to Cambria's opening claim construction brief, which Cambria argues were untimely disclosed under the terms of the pretrial scheduling order in this case. *See* ECF No. 83 at 5–6, 8. Because resolution of Cambria's request affects the scope of the evidence and arguments the Court will consider for purposes of claim construction, the Court addresses that issue first.

Generally, a party who does not timely disclose information required to be disclosed by Rule 26(a) "shall not be permitted to use the nondisclosed information as evidence at a trial, at a hearing, or on a motion" unless the nondisclosure is "harmless" or there is "substantial justification" for the nondisclosure. *Thompson v. Manitex, Inc.*, No. 04-cv-3046 (JRT/FLN), 2006 WL 748280, at *5 (D. Minn. Mar. 22, 2006) (quoting *Trost v. Trek*

*Bicycle Corp.*, 162 F.3d 1004, 1008 (8th Cir. 1998)); *see* Fed. R. Civ. P. 37(c)(1). Rule 16 authorizes courts "to set management deadlines and to impose sanctions for their violation." *Thompson*, 2006 WL 748280, at *5; *see* Fed. R. Civ. P. 16(b), (f). Under these Rules, therefore, a party in a patent case who does not timely disclose its positions and contentions on infringement and validity "risk[s] losing the opportunity later to rely on information that was not properly disclosed." *CellTrust*, 625 F. Supp. 3d at 848 (citation omitted). A district court has "broad discretion" in deciding whether to admit or exclude evidence that "was not properly disclosed in compliance with the court's pretrial orders." *Id.* (citing *Philip v. Ford Motor Co.*, 328 F.3d 1020, 1024 (8th Cir. 2003)).

Cambria asserts that SQIP has introduced two new proposed constructions relating to the "first device" and "computer processor" terms in claims 1 and 14 of the '516 Patent, which were not raised in the parties' Joint Claim Construction Statement (ECF No. 63-1). *See* ECF No. 83 at 5–6, 8. Cambria further asserts that SQIP relies on expert testimony and extrinsic evidence that were previously undisclosed. *See id.*

In support of its waiver argument, Cambria cites *DoseLogix, LLC v. Reflex Medical Corp.*, No. 21-cv-1275 (ECT/DJF), 2022 WL 16849070 (D. Minn. Nov. 10, 2022), a patent infringement case involving similar issues during claim construction. There, the defendant raised a new argument in response to the plaintiff's opening claim construction brief that was not disclosed in the parties' joint claim construction statement, and the plaintiff sought leave to file a reply brief addressing the new argument. *Id.* at *1. But the plaintiff also had filed a declaration in support of its response to the defendant's opening claim construction brief which had not been disclosed in the joint claim construction statement, and the

defendant likewise sought leave to file a reply brief addressing the declaration. *Id.* The court denied both parties' requests for additional briefing, citing the pretrial case management order which stated that the joint claim construction statement "must include . . . each party's proposed construction of each disputed claim term, phrase, or clause," along with identifying all intrinsic and extrinsic evidence on which the parties intended to rely for purposes of claim construction. *Id.* at *2. The court explained that allowing the parties to propose new constructions or raise evidence that was previously undisclosed and granting the parties leave to file additional briefing "would require modification of the Pretrial Case Management Order," which neither party requested, and that such modification would require a showing of "good cause," which neither party had "attempted to show." *Id.*

SQIP, for its part, does not dispute that it raised new proposed constructions and relied on a previously undisclosed expert's testimony in its response to Cambria's opening claim construction brief. *See* ECF No. 86 at 3. Instead, SQIP responds merely by citing a different case from this District, *Oxygenator Water Technologies, Inc. v. Tennant Company*, No. 20-cv-358 (ECT/HB), 2021 WL 3661587 (D. Minn. Aug. 18, 2021). In that case, the defendant argued that the plaintiff waived an argument because the plaintiff "fail[ed] to raise it early enough in the claim construction phase of the litigation." *Id.* at *9 n.7. The court disagreed, explaining that the plaintiff "raised th[e] argument in its opening claim construction memorandum, and [the defendant] had an opportunity to respond to it." *Id.*

The Court observes that the pretrial scheduling order in this case, like the one in *DoseLogix*, states that the parties' Joint Claim Construction Statement "must contain,"

among other things, "each party's proposed construction of each disputed claim term, phrase, or clause, together with an identification of all references from the specification [or] prosecution history to support that construction, and an identification of any extrinsic evidence known to the party on which it intends to rely." ECF No. 44 at 8–9. SQIP plainly did not adhere to the terms of the pretrial scheduling order as it relates to the disclosures required in Joint Claim Construction Statement.

However, unlike in *DoseLogix*, and more like *Oxygenator Water Technologies*, the order establishing the briefing schedule for claim construction in this case, ECF No. 70—which the parties jointly proposed, ECF No. 69—permitted Cambria to file a reply to SQIP's responsive brief, ECF No. 70 at 1. As such, no modification to the pretrial scheduling order—and, relatedly, no showing of "good cause" to modify the pretrial scheduling order—was necessary for Cambria to address SQIP's new proposed constructions and evidence.

At the claim construction hearing, Cambria asserted that it was prejudiced by having to address proposed constructions and expert testimony that it did not anticipate in light of the word-count limit imposed by the claim construction briefing order. *See* ECF No. 70 at 2. But the Court notes that, notwithstanding its limited word count, Cambria addressed SQIP's newly raised constructions and evidence in its reply brief in addition to raising its waiver argument, *see generally* ECF No. 83, and was prepared to discuss the disputed constructions and evidence in depth at the claim construction hearing. Further, the Court observes that SQIP's arguments and new constructions, while different from its representations in the Joint Claim Construction Statement, are largely responsive to

18

Cambria's arguments in its opening brief and do not "introduce a wholly new theory of the case." *Thompson*, 2006 WL 748280, at *5.

Therefore, notwithstanding SQIP's noncompliance with the terms of the pretrial scheduling order, its failure to disclose its proposed constructions and related evidence in the Joint Claim Construction Statement ultimately was harmless, and any resulting prejudice to Cambria was minimal. *See id.*; *cf. Thudium v. Allied Prods. Corp.*, 36 F.3d 767, 770 (8th Cir. 1994) (affirming district court's decision to allow revised and otherwise previously undisclosed expert testimony at trial because it "did not constitute unfair surprise and was not prejudicial"). Accordingly, the Court, in its discretion, will consider the late-disclosed constructions by SQIP to the extent they are helpful to the Court in construing the disputed claim terms.

The Court reiterates, however, that SQIP plainly did not comply with the terms of the pretrial scheduling order. Although it should go without saying, the Court emphasizes that it expects the parties, through their counsel, to abide by the Federal Rules of Civil Procedure, this District's Local Rules, and this Court's orders. The Court excuses SQIP's noncompliance with the pretrial scheduling order at this juncture, largely because Cambria still had an opportunity to respond here. But SQIP is warned that any future noncompliance with the Court's orders, regardless of the nature of such orders, will be closely scrutinized and at SQIP's peril.

## II.   Disputed Claim Terms

The parties dispute the meanings of the following claim terms and phrases: (1) "first device," as used in claim 1 of the '516 Patent; (2) "computer processor," as used in claims 1

and 14 of the '516 Patent; (3) "a second material having a color" and "the color of the second material," as used in claim 3 of the '912 Patent; and (4) "a material having a color" and "a color of a deposited material" as used in claim 5 of the '912 Patent.

Because "[c]laim construction requires a determination as to how a [POSITA] would understand a claim term," *Trs. of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1362 (Fed. Cir. 2016), the Court begins with a brief discussion of the parties' competing definitions of a POSITA in the context of the Patents-in-Suit, then turns to analyzing the disputed claim terms.

### A.    Qualifications of a POSITA

The parties offer overlapping, but meaningfully distinct, qualifications a POSITA must have in the context of the Patents-in-Suit.  Cambria proposes that a POSITA would have: (1) "at least a bachelor's degree in mechanical engineering, chemical engineering, materials science, materials engineering, or a related field"; and (2) "at least two years of work experience or the equivalent graduate study in the design or manufacture of composites."  ECF No. 71 at 7.

SQIP, on the other hand, proposes that a POSITA would have: (1) "[at] least a four-year degree in mechanical engineering or a related field"; and (2) "at least two years of work experience in specialized mechanical devices and/or manufacturing equipment, including mechanical devices and/or manufacturing equipment controlled by computers." ECF No. 81 at 10.

Differences aside, SQIP asserts that its expert meets Cambria's proposed definition. *Id.* (citing ECF No. 82-3 ¶¶ 33–34).  Therefore, for purposes of claim construction, and

without deciding the issue or adopting either definition, the Court proceeds with the analysis under Cambria's proposed definition of a POSITA.

### B. "First Device" ('516 Patent, Claim 1)

Cambria asserts, and SQIP does not dispute, that the term "first device" as used in claim 1 of the '516 Patent is in means-plus-function form and subject to Section 112(f). ECF No. 71 at 16–20; ECF No. 81 at 12. The parties agree that the "first device" must be capable of achieving three functions: (1) "supply a first mixture of quartz and resin to the inner chamber of the mold"; (2) "supply the first mixture of the mold through a first region of the top opening but not through a second region of the top opening during a first state"; and (3) "supply the first mixture to the inner chamber of the mold through the second region of the top opening, but not through the first region of the top opening during a second state." ECF No. 63-1 at 2–3; *see also* '516 Patent at 12:1–11. Cambria does not dispute that the '516 Patent recites a sufficient structure to achieve the claimed functions. ECF No. 71 at 17–20. The dispute therefore lies in *which* structure or structures disclosed in the '516 Patent correspond to the claimed functions. *See Dyfan*, 28 F.4th at 1367.

Cambria proposes the following construction for "first device" in claim 1: "a combined structure comprising a hopper, a belt, and rollers, said combined structure capable of being moved into different stopped positions along the length of the top opening of the mold to supply a first mixture of quartz and resin to the inner chamber of the mold." ECF No. 71 at 14. Although Cambria acknowledges that the '516 Patent discloses "other devices that could potentially perform the *first* function of the 'first device,'" Cambria asserts that the "combined structure" it describes in its proposed construction is the only

21

structure disclosed in the '516 Patent that is "clearly linked" to *all three* claimed functions. *Id.* at 17–18.  Cambria notes that SQIP amended claim 1 and added the latter two functions during prosecution of the '516 Patent, including the terms "region" and "state," and contemporaneously cited only figure 1 of the '516 Patent in its arguments to the PTO relating to those amendments.  *Id.* at 17–20.  And Cambria argues that since figure 1 of the '516 Patent discloses only the hopper/belt/roller structure, SQIP disclaimed other embodiments as it relates to the "first device."  *See id.*; *see also* '516 Patent, fig 1.

> SQIP, on the other hand, proposes the following construction:
>
> [A] system of hopper or hoppers, in combination with any of, or a plurality of any of: (a) a funnel or funnels with a motor and optionally a valve or valves or (b) a belt (or belts) and rollers with a motor and optionally a valve or valves.  The system can also include belts or racks and rollers, cable structure, hydraulic mechanism structure, or pneumatic structure with a motor or motors which provide a force resulting in relative motion between (a) the mold and (b) hopper/hoppers and/or funnel/funnels and equivalents thereof.

ECF No. 81 at 12–13.  SQIP asserts that the '516 Patent's specification contains references to several different structures which could achieve all the claimed functions, including not only the hopper/belt/roller embodiment in figure 1 but also structures employing hoppers and funnels like those disclosed in figures 3 through 5.  *Id.* at 13–14.  SQIP argues that Cambria's proposed construction improperly narrows the scope of "first device" because it excludes the latter embodiments.  *Id.* at 16–17.  SQIP further contends that its amendments and supporting arguments during prosecution of the '516 Patent do not limit the scope of "first device," pointing to the permissive language it used when referencing specific embodiments that is not naturally read or understood to be exclusive.  *Id.* at 17–19.

The Court largely agrees with SQIP. Cambria attempts to import limitations into the disputed claims which would exclude from their scope several clearly identified embodiments described in the specification. This is improper. *See Phillips*, 415 F.3d at 1323. For example, under Cambria's proposed construction, only the combined structure, not the mold, moves to achieve the claimed functions. *See* ECF No. 71 at 14. But the specification and prosecution history for the '516 Patent plainly contemplate that either the "first device" *or* the mold may be moved relative to each other. *See* '516 Patent at 2:1–5 (explaining that the first device "may include means for *moving the mold* to allow placement of . . . mixtures of quartz and resin in specific areas of the inner chamber" of the mold (emphasis added)); ECF No. 72-6 at 17 ("[I]n the present application the combined structures of, for example, first hopper 2, belt 6, and roller 8 and/or 10, *are moved* in the directions D2 and D3 . . . ." (emphasis added)).

Further, Cambria's argument that SQIP limited the scope of the "first device" term during the prosecution of the '516 Patent only to the hopper/belt/roller embodiment, *see* '516 Patent at fig. 1, is unpersuasive. To overcome the examiner's initial rejection of claim 1 of the '516 Patent as anticipated by the prior art—including Cambria's '819 Patent—SQIP distinguished the '516 Patent on the basis that the prior art references cited by the examiner did not disclose use of a computer processor to achieve the claimed functions. *See* ECF No. 72-6 at 16–18. In doing so, SQIP cited only the hopper/belt/roller structure in figure 1 as an exemplary embodiment, *see id.*, but it did not "unequivocally disavow[]" other embodiments, *Chimie*, 402 F.3d at 1384. The Court is not convinced that SQIP's arguments during prosecution of the '516 Patent would be reasonably understood

by a POSITA to exclude embodiments other than the hopper/belt/roller structure. *See, e.g.*, ECF No. 72-6 at 17 ("In contrast, in the present application the combined structures of, *for example*, first hopper 2, belt 6, and roller 8 and/or 10 . . . ." (emphasis added)).

Nor is the Court persuaded by Cambria's argument that the specification for the '516 Patent does not "clearly link or associate" the devices in SQIP's construction to the claimed functions. ECF No. 83 at 6–8. While the passage cited by SQIP—'516 Patent at 2:63–3:4—does not specifically identify the various component parts of the "first device" in SQIP's proposed construction, those components are clearly linked to the "first device" term in other parts of the specification. The specification and figures clearly describe and depict embodiments which include as part of the "first device": (1) one or more hoppers, belts, and rollers, *see id.* at 2:11–12, fig. 1; (2) one or more hoppers and funnels, *see id.* at 2:39–48, figs. 3–5; (3) one or more valves, *see id.* at 2:25–32, 3:34–44, figs. 1, 3–5; and (4) a "means for moving the mold to allow placement of the first and/or second and/or more further mixtures of quartz and resin in specific areas of the inner chamber" of the mold which "may include . . . belts or racks and rollers, cable structures, hydraulic mechanism structure, pneumatic structure, or other methods or combined methods of driving mechanism," *id.* at 2:1–10. In addition, as it relates to the hopper/funnel embodiments, the specification states that the "first device may be further comprised of a first motor for controlling an orientation of the first funnel so that the bottom opening of the first funnel can be placed at different locations with respect to the top opening of the mold." *Id.* at 2:44–48. These components, with direction from claim 1's "computer processor," are the means by which claim 1's functions are achieved.

24

The Court finds SQIP's proposed construction, while largely supported by the specification, to be somewhat difficult to parse. And the Court is not bound by either party's specific proposed construction. *Homeland Housewares*, 865 F.3d at 1376. Bearing in mind that the purpose of claim construction is to provide a legal standard that lay jurors can understand, *see Kaufman*, 34 F.4th at 1370, the Court modifies SQIP's proposed construction and construes "first device" to mean:

> A system of one or more hoppers in combination with any of, or a plurality of any of, (a) one or more funnels with a motor and, optionally, one or more valves, or (b) one or more belts and rollers with a motor and, optionally, one or more valves; and further comprising a driving mechanism with a motor which provides a force resulting in relative motion between the mold and the one or more hoppers.

## C.    "Computer Processor" ('516 Patent, Claims 1 and 14)

Cambria asserts that "computer processor," as used in claims 1 and 14 of the '516 Patent, is in means-plus-function form (for claim 1) and step-plus-function form (for claim 14) and therefore is subject to analysis under Section 112(f). *See* ECF No. 71 at 23–26. Cambria further contends that the term renders claims 1 and 14 indefinite because the '516 Patent does not disclose sufficient structure or acts for the related "computer processor" functions. *See id.* at 26–31.

SQIP responds that "computer processor" is neither in means-plus-function form (for claim 1) nor in step-plus-function form (for claim 14). *See* ECF No. 81 at 19–31. SQIP further argues that if the Court agrees that Section 112(f) does not apply, Cambria's indefiniteness argument fails. This is because Cambria's theory is premised solely on the application of Section 112(f). *See id.* at 22–24, 31. Finally, SQIP contends that even if

Section 112(f) applies, the term is not indefinite because the '516 Patent discloses sufficient structure (for claim 1) and acts (for claim 14). *See id.*

SQIP is correct that the absence of the terms "means" in claim 1 or "step for" in claim 14 creates a presumption that Section 112(f) does not apply. *See Dyfan*, 28 F.4th at 1365; *Masco Corp.*, 303 F.3d at 1326. But Cambria may rebut that presumption by showing that the "computer processor" term as used in the disputed claims does not "connote[] sufficiently definite structure to a [POSITA]." *Dyfan*, 28 F.4th at 1365.

Although claims 1 and 14 both use the disputed "computer processor" term, patent claims are to be "presumed valid independently of the validity of other claims." 35 U.S.C. § 282(a). Bearing in mind that independent patent claims are to be construed on a claim-by-claim basis, *see Vascular Sols.*, 117 F.4th at 1370, the Court addresses the "computer processor" term separately for claims 1 and 14.

###    i.    Claim 1 of the '516 Patent

Cambria suggests that "computer processor" as used in claim 1 is a nonce term that does not connote sufficiently definite structure. *See* ECF No. 71 at 23–24. Cambria argues that claim 1's "computer processor" is a means for controlling the "first device" functions discussed above, but that the '516 Patent's specification "never describes what it is, what its components are, or how it works." *Id.* Cambria contends that the specification instead "describes 'a computer processor' by its *function*—i.e., what it *achieves* ('control' other devices)." *Id.* at 24. Cambria further argues that a POSITA would not understand the meaning of "computer processor" because "there is no evidence that off-the-shelf 'computer processors' existed" at the time SQIP applied for the '516 Patent. *Id.* Cambria's

expert, Tim Osswald, Ph.D., opines that "computer processor" is not a term of art and does not convey known structures to POSITAs.  ECF No. 73 ¶¶ 92–99.

In response, SQIP asserts that "computer processor" is not a nonce term that triggers Section 112(f).  ECF No. 81 at 20.  SQIP's expert, L. Brun Hilbert, Jr., Ph.D., opines that a POSITA "would generally associate the phrase 'computer processor' with 'CPU,' an acronym defined as 'central processing unit: the key component of a computer system, which contains the circuitry necessary to interpret and execute program instructions.'" ECF No. 82-3 ¶ 116 (citation omitted).  According to Dr. Hilbert, a POSITA also would have "understood that a 'computer processor' would be synonymous with other terms such as 'microprocessor,'" which have been "widely used in manufacturing for at least 40 years."  *Id.* ¶ 119.  Dr. Hilbert finds Dr. Osswald's contention that a POSITA would not be familiar with the term "computer processor" to be "especially surprising" because under either party's definition of a POSITA in the context of the Patents-in-Suit, "a POSITA . . . would have encountered computer processors early in their professional experience and education."  *Id.* ¶¶ 117–18.  Dr. Hilbert agrees with Dr. Osswald that "'computer processor' is not a term of art," but does not agree with the level of significance Dr. Osswald attaches to that fact because "it is a widely proliferated term, which would connote a definite structure to most individuals with any technical background, much less a POSITA."  *Id.* ¶ 114.  SQIP also highlights that during prosecution of the '516 Patent, the patent examiner "did not find claim 1's 'computer processor' term to be a means-plus-function term."  ECF No. 81 at 20.

As a general matter, the Federal Circuit has not squarely addressed whether "computer processor," specifically, is a nonce term, but it has at least implied in its decisions that "computer processor" is not such a term. *See WSOU Invs. LLC v. Google LLC*, No. 2022-1063, 2023 WL 6889033, at *3 (Fed. Cir. Oct. 19, 2023) (explaining that "the term 'processor' is not a nonce word" but that "there is no categorical rule regarding whether the term 'processor' connotes sufficient structure to avoid interpretation in means-plus-function format"); *Inventio AG v. ThyssenKrupp Elevator Ams. Corp.*, 649 F.3d 1350, 1359–60 (Fed. Cir. 2011) (finding the term "computing unit" connoted sufficient structure), *overruled on other grounds by Williamson*, 792 F.3d at 1339. And as one district court explained:

> Words such as computer, microprocessor, [and] processor . . . will not be considered nonce words and will not rebut the presumption that § 112(f) does not apply if a [POSITA] can "reasonably discern" from the claim language that the words . . . are a specific reference to conventional items "existing in the prior art at the time of the" invention.

*Razor USA LLC v. DLG Grp., Ltd.*, Civ. No. 19-12939 (JMV) (MF), 2021 WL 651257, at *13 (D.N.J. Feb. 19, 2021) (quoting *Zeroclick, LLC v. Apple Inc.*, 891 F.3d 1003, 1008 (Fed. Cir. 2018)).

Further, because the means-plus-function inquiry "turns on the understanding of a [POSITA], [courts] often look to extrinsic evidence when determining whether a disputed limitation would have connoted structure to a person of ordinary skill." *Dyfan*, 28 F.4th at 1366. "In cases where it is clear that a claim term itself connotes some structure to a [POSITA], 'the presumption that [Section 112(f)] does not apply is determinative' in the absence of 'more compelling evidence of the understanding of one of ordinary skill in the

art.'" *Id.* (quoting *Apex Inc. v. Raritan Comput., Inc.*, 325 F.3d 1364, 1373 (Fed. Cir. 2003)).

The Court finds SQIP's arguments more persuasive. While Cambria argues that the specification for the '516 Patent does not offer a specific structural definition of the term "computer processor," the Court notes that claim terms may "describe a class of structures and still recite sufficiently definite structure." *Id.* at 1366 (citation modified). And although "computer processor" refers to a broad class of structures, a POSITA would have reasonably understood it to be "a specific reference to conventional items 'existing in the prior art at the time of'" the invention disclosed in the '516 Patent. *Razor USA*, 2021 WL 651257, at *13 (quoting *Zeroclick*, 891 F.3d at 1008); *see also* ECF No. 82-3 ¶ 118 (Dr. Hilbert opining that "a POSITA (who has . . . an undergraduate degree in engineering) would have encountered computer processors early in their professional experience and education"). Further, a POSITA would have understood the term "computer processor" to be "synonymous with . . . terms such as 'microprocessor'" and that such technology has "been widely used in manufacturing for at least 40 years." ECF No. 82-3 ¶ 119; *see also* ECF No. 82-7 at 3–4 (discussing how, by 1982, "the development of the microprocessor" had helped overcome the "obstacles" in automating manufacturing and "[made] possible the development of manufacturing machinery with unique adaptability" in "industrial settings").

Further, structure can be recited sufficiently to avoid invoking Section 112(f) by describing the claim limitation's operation and "how the function is achieved in the context of the invention." *Dyfan*, 28 F.4th at 1366 (citation omitted). The '516 Patent's

specification does that: it explains that the "computer processor . . . communicates with the first device to control how much of the first mixture of quartz and resin is supplied to the inner chamber of the mold." '516 Patent at 2:60–3:4; *see also, e.g.*, *id.* at 6:31–32 ("The computer processor 602 is also connected by communications links to motor 616 for roller 44."); *id.* at 5:43–45 ("The computer processor 602 of FIG. 8 individually controls the valves 4, 14, and 24 which control opening sizes for openings 2b, 12b, and 22b, respectively."). These descriptions "clearly link[] or associate[]" the "computer processor" structure "to the function recited in the claim." *Saffran*, 712 F.3d at 562; *see also* '516 Patent at 12:4–11 (reciting "a computer processor which is configured to control the first device to supply the first mixture to the inner chamber of the mold").

Finally, while not dispositive, the Court observes that during the prosecution of the '516 Patent, the examiner did not find claim 1's "computer processor" to be a means-plus-function limitation, which supports the Court's conclusion here. *See Arthrex, Inc. v. Parcus Med., LLC*, No. 2:22-cv-19-JLB-NPM, 2023 WL 4305235, at *4 (M.D. Fla. June 30, 2023) ("While the USPTO's failure to find that Section 112(f) applies is not binding on the Court, it is certainly instructive given the thoroughness and specialized knowledge with which the USPTO undertakes patent examinations."); *see also Brooktree Corp. v. Advanced Micro Devices, Inc.*, 977 F.2d 1555, 1574 (Fed. Cir. 1992) (explaining that the presumption of validity for issued patents is "based in part on the expertise of patent examiners [who are] presumed to have done their job").

Because the Court believes that "computer processor" would be "understood by [POSITAs] to have a sufficiently definite meaning as the name for structure," *Williamson*,

792 F.3d at 1349, the Court finds that Section 112(f) does not apply.  And because Cambria's argument that the term is indefinite hinges on the Court finding that Section 112(f) *does* apply, the Court does not find the term indefinite.

Cambria alternatively argues that if the Court finds that Section 112(f) does not apply, the "computer processor" term should be construed to mean: "a computer-controlled motor for moving the combined structure into different stopped positions along the length of the top opening of the mold."  ECF No. 71 at 14.  SQIP urges the Court to reject Cambria's alternative construction because "there is no basis to find that a motor must be a part of the computer processor."  ECF No. 81 at 32.

Again, the Court agrees with SQIP.  The specification treats the "computer processor" as separate from the motors—which are part of the "first device," as discussed above—to which the "computer processor" issues commands to achieve the claimed functions.  *See, e.g.*, '516 Patent at 6:31–32 ("The computer processor 602 is also connected by communications links to motor 616 for roller 44."); *id.* at 6:33–37 ("The computer processor 602, in at least one embodiment is configured to send commands or signals to motor 616 to cause the belt 42 to move back and forth, or stop, or slow down or speed up, and/or oscillate, in the directions D2 and D3.").  The Court therefore declines to adopt Cambria's alternative construction because it would import limitations that are not supported by the '516 Patent's specification. *See Am. Piledriving Equip.*, 637 F.3d at 1331; *Phillips*, 415 F.3d at 1323.

For these reasons, the Court finds that no construction is necessary for claim 1's "computer processor" term.

### ii.    Claim 14 of the '516 Patent

Cambria similarly argues that "computer processor" as used in claim 14 of the '516 Patent—a method claim—is in step-plus-function form and subject to analysis under Section 112(f). ECF No. 71 at 23–26. For claim 14, Cambria asserts that the '516 Patent's specification does not disclose sufficient acts to achieve the claimed functions. *Id.* at 23–28. More specifically, Cambria argues that "'using a computer processor' does not recite sufficient acts to 'controllably supply'" quartz-resin mixtures into a mold. *Id.* at 26. Cambria further argues that the '516 Patent's specification does not provide adequate acts to achieve the claimed functions, which renders the claim indefinite. *Id.* at 27.

SQIP responds that claim 14's "computer processor" term is not a step-plus-function limitation for largely the same reasons that it argues claim 1's "computer processor" term is not a means-plus-function limitation. ECF No. 81 at 27–31. SQIP argues that "using a computer processor" recites an act, not a function. *Id.* at 29. SQIP further argues that the "controllably supply" terms that follow also do not recite functions but rather "describe the method steps." *Id.*

The Federal Circuit has recognized that step-plus-function claiming is not typical. *See Williamson*, 792 F.3d at 1349 (noting that step-plus-function claiming arises under "unusual circumstances"). Nonetheless, the Federal Circuit has explained that Section 112(f) is implicated in the context of a method claim "only when steps plus function *without acts* are present." *Masco Corp.*, 303 F.3d at 1326 (quoting *O.I. Corp. v. Tekmar Co.*, 115 F.3d 1576, 1582 (Fed. Cir. 1997)). And like means-plus-function claims, "where a method claim does not contain the term 'step[s] for,' a limitation of that claim cannot be construed

as a step-plus-function limitation without a showing that the limitation contains no act." *Id.* at 1327 (alteration in original). Because claim 14 does not contain the term "step(s) for," the inquiry therefore turns on the distinction between "acts" and "functions."

Judge Randall Rader's concurrence in *Seal-Flex, Inc. v. Athletic Track and Court Construction*, 172 F.3d 836 (Fed. Cir. 1999), is instructive. As Judge Rader explained:

> In general terms, the "underlying function" of a method claim element corresponds to *what* that element ultimately accomplishes in relationship to what the other elements of the claim and the claim as a whole accomplish. "Acts," on the other hand, correspond to *how* the function is accomplished. Therefore, claim interpretation focuses on what the claim limitation accomplishes, i.e., [its] underlying function, in relation to what is accomplished by the other limitations and the claim as a whole. If a claim element recites only an underlying function without acts for performing it, then [Section 112(f)] applies even without express step-plus-function language.

*Id.* at 849–50 (Rader, J., concurring).

With Judge Rader's explanation in mind, the Court finds that claim 14's "computer processor" is not a step-plus-function limitation. Again, the fact that the PTO did not find claim 14's "computer processor" to be a step-plus-function limitation during prosecution of the '516 Patent is instructive. *See Arthrex*, 2023 WL 4305235, at *4; *Brooktree Corp.*, 977 F.2d at 1574. And as SQIP persuasively argues, the "ultimate function" of claim 14 is "producing quartz slabs having a particular appearance." ECF No. 86 at 1–2; *see* '516 Patent at 1:47–49 ("This invention addresses a method of producing a quartz based slab with single color patterns or multiple color patterns and/or veins."). "[U]sing a computer processor to controllably supply" quartz-resin mixtures to particular parts of a mold is an act that "correspond[s] to *how* the function is accomplished." *Seal-Flex*, 172 F.3d at 849–

50 (Rader, J., concurring). Because Cambria's indefiniteness argument hinges on a finding that claim 14's "computer processor" term is a step-plus-function limitation, the Court declines to find the term indefinite.

As with claim 1's "computer processor," Cambria argues, in the alternative, that if the Court finds claim 14's "computer processor" term is not indefinite, the Court should construe claim 14's "computer processor" term to mean: (1) "moving, by a computer-controlled motor, a combined structure comprising a hopper, a belt, and rollers into different stopped positions along the length of the top opening of the mold," for the first "computer processor" clause; and (2) "moving, by the computer-controlled motor, the combined structure into different stopped positions along the length of the top opening of the mold," for the second "computer processor" clause. ECF No. 71 at 15.

The Court again declines to adopt Cambria's proposed alternative constructions for the same reasons discussed above with regard to claim 1's "computer processor." In short, the Court is persuaded that a POSITA understands the term. And as with claim 1's computer processor term, the Court finds that no construction is necessary for claim 14's "computer processor" term.

**D.    "A Second Material Having a Color" and "The Color of the Second Material" ('912 Patent, Claim 3)**

Cambria asserts that claim 3 of the '912 Patent is indefinite with regard to the "color" phrases. ECF No. 71 at 35–37. Specifically, Cambria contends that claim 1's recitation of a "first material having a color," which is deposited into a crack in a quartz slab created in a prior step, renders claim 3's recitation of a "second material having a

color" indefinite because it is unclear whether "the color of the first material" from claim 1 is the same as "the color of the second material" from claim 3. *Id.* at 36.

SQIP responds that a "plain reading" of claim 3 indicates that "the color of the material sprayed into the second crack is different from the material sprayed into the first crack." ECF No. 81 at 45. SQIP contends that a POSITA "would understand that the only reason for the disclosure that a second color would be needed is if it were different from the first color; otherwise, there would be no need to discuss the second color." *Id.* at 46.

SQIP's reading of claim 3 does not comport with the specification. Indeed, the portion of the specification that SQIP cites does not offer any clarity as to whether "the color of the second material" *must* be different from "the color of the first material." For example, in describing one embodiment, the specification states that "[a] second color of dye or quartz and resin mixture, which *could be* different from the slab 350 and different from the first color of filling material *could be* used if needed." '912 Patent at 13:57–61 (emphasis added). Contrary to SQIP's argument, the permissive "could be" language suggests that "the color of the first material" and "the color of the second material" "could be" different, but they also "could be" the same. The specification does not expressly or even impliedly exclude either option and, in fact, appears to contemplate both.

But even assuming Cambria is correct that claim 3 is broader than SQIP suggests, Cambria's argument that claim 3's breadth must result in a finding of indefiniteness is unconvincing. Section 112 does not require a patentee to use the most precise language possible. *See Nautilus*, 572 U.S. at 910 (quoting *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 731 (2002)) ("Some modicum of uncertainty . . . is the 'price

of ensuring the appropriate incentives for innovation.'"). And breadth does not necessarily indicate indefiniteness. *See Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*, 30 F.4th 1339, 1347 (Fed. Cir. 2022) ("[A] claim is not indefinite just because it is broad."); *BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1367 (Fed. Cir. 2017) (citation omitted) ("[B]readth is not indefiniteness."). The Court's concern here is whether claim 3, read in light of the intrinsic and extrinsic evidence, provides *reasonable*—not *total*—certainty of the scope of the claimed invention. *See Nautilus*, 572 U.S. at 901.

What is clear, at bottom, is that the "first crack" created in claim 1 is filled with a "first material" that has "a color" which causes the resulting vein to have "the color of the first material." '912 Patent at 15:5–17. And the "second crack" created in claim 3, which depends from claim 1, is filled with a "second material" that has "a color" which causes the resulting vein to have "the color of the second material." *Id.* at 15:32–43. Whether those colors are the same does not appear to matter; indeed, as the specification explains, the second material's color "*could be* . . . different from the first color of filling material." *Id.* at 13:57–59 (emphasis added).

For these reasons, the Court does not find the phrases "a second material having a color" and "the color of the second material" indefinite.

### E.   "A Material Having a Color" and "A Color of a Deposited Material" ('912 Patent, Claim 5)

The parties raise essentially the same arguments as those described above for the phrases "a material having a color" and "a color of a deposited material" in claim 5 of the '912 Patent. Cambria argues that the disputed phrases are "even more ambiguous than

claim 3." ECF No. 71 at 38. SQIP, on the other hand, argues that Cambria "attempts to manufacture ambiguity where there is none." ECF No. 81 at 48.

While directed toward a similar function, claim 5 is undoubtedly more broadly drafted than claim 3. Claim 5, like claim 3, depends from claim 1 and recites a method for manufacturing "a quartz based slab with . . . multiple color patterns and/or veins." '912 Patent at 2:1–3. Claim 5 recites "depositing *a material* having a color into the plurality of further cracks" recited in the preceding clause, such that "the plurality of further cracks of the slab become veins having *a color* of *a deposited material*." *Id.* at 15:56–59 (emphasis added). By contrast, claim 3 recites, in relevant part, "depositing *a second material* having a color into the second crack of the slab, so that the second crack with *the deposited second material* becomes a vein having *the color of the second material*." *Id.* at 15:40–43 (emphasis added). When viewed side-by-side, the breadth of claim 5 relative to claim 3 is readily apparent. Most notably, as Cambria highlights, and unlike claim 3, claim 5 does not specify whether "a material" is the same material as the "first material" in claim 1. *See* ECF No. 71 at 38.

It is true that SQIP likely could have drafted claim 5 in more precise terms. For example, SQIP could have recited "depositing a material, *which may be the same as the first material*, having a color, *which may be the same color as the color of the first material*." Or SQIP could have clarified, using definite rather than indefinite articles, that "the plurality of further portions of the slab become veins having *the* color of *the* deposited material." But, again, Section 112 does not require a patentee to use the most precise language possible. *See Nautilus*, 572 U.S. at 910. And the Court is unconvinced that a

37

POSITA would not understand the scope of claim 5 as written. Further, the Court bears in mind that the presumption of patent validity is "based in part on the expertise of patent examiners [who are] presumed to have done their job," *Brooktree*, 977 F.2d at 1574, and although it is not dispositive and does not bind this Court, the fact that the examiner who approved the '912 Patent evidently did not raise concerns about indefiniteness as to claim 5 is at least somewhat persuasive, *see Arthrex*, 2023 WL 4305235, at *4.

Both parties raise compelling arguments in support of their positions, and whether claim 5 is indefinite is admittedly a much closer call than it is with claim 3. But given that indefiniteness must be proven "by clear and convincing evidence," *Sonix Tech.*, 844 F.3d at 1377, the fact that it is a close call weighs in favor of declining to find claim 5 indefinite—at least for now. However, the Court rejects Cambria's indefiniteness argument without prejudice, so Cambria may raise its argument again at a later stage of these proceedings with the benefit of additional expert discovery.

## CONCLUSION

To summarize, the table below contains the Court's constructions of the disputed claim terms, to the extent they need to be construed:

| Patent/Claim | Disputed Term(s) | Construction |
|---|---|---|
| '516 Patent, claim 1 | "first device" | "a system of one or more hoppers in combination with any of, or a plurality of any of, (a) one or more funnels with a motor and, optionally, one or more valves, or (b) one or more belts and rollers with a motor and, optionally, one or more valves; and further |

|  |  | comprising a driving mechanism with a motor which provides a force resulting in relative motion between the mold and the one or more hoppers" |
|---|---|---|
| '516 Patent, claim 1 | "computer processor" | No construction necessary. |
| '516 Patent, claim 14 | "computer processor" | No construction necessary. |
| '912 Patent, claim 3 | "a second material having a color" and "the color of the second material" | No construction necessary. |
| '912 Patent, claim 5 | "a material having a color" and "a color of a deposited material" | No construction necessary. |

## ORDER

Based on the foregoing, and on all the files, records, and proceedings in this matter,

**IT IS HEREBY ORDERED** that:

1.    The term "first device" in claim 1 of the '516 Patent means: "a system of one or more hoppers in combination with any of, or a plurality of any of, (a) one or more funnels with a motor and, optionally, one or more valves, or (b) one or more belts and rollers with a motor and, optionally, one or more valves; and further comprising a driving mechanism with a motor which provides a force resulting in relative motion between the mold and the one or more hoppers";

2.    The term "computer processor" in claim 1 of the '516 Patent is not a means-plus-function limitation, is not indefinite, and requires no construction;

3.    The term "computer processor" in claim 14 of the '516 Patent is not a step-plus-function limitation, is not indefinite, and requires no construction;

4.    The phrases "a second material having a color" and "the color of the second material" in claim 3 of the '912 Patent are not indefinite and require no construction;

5.    The phrases "a material having a color" and "a color of a deposited material" in claim 5 of the '912 Patent are not indefinite and require no construction; and

6.    Cambria's indefiniteness argument as to claim 5 of the '912 Patent is rejected without prejudice such that Cambria may raise it again at a later stage of these proceedings.

Dated: October 21, 2025              *s/Laura M. Provinzino*
                                     Laura M. Provinzino
                                     United States District Judge

40